**Jora DAVIDOV, Petitioner,**

v.

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION, Respondent.**

**No. M–29.**

United States District Court, S.D. New York.

Feb. 17, 2006.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

Petitioner Jora Davidov moves to quash subpoenas issued by respondent United States Securities and Exchange Commission ("SEC") in the underlying investigation. Movant asserts that the Right to Financial Privacy Act ("RFPA" or "the Act"), 12 U.S.C. §§ 3401–3422, prohibits these subpoenas because there is no reason to believe the information sought is relevant to a legitimate law enforcement inquiry. The SEC opposes Davidov's motion. For the reasons that follow, the Court denies the motion to quash and enforces the subpoenas.

## I. THE RFPA

Congress enacted the RFPA in 1978 as a response to the Supreme Court's decision in *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), that a bank depositor had no protectible Fourth Amendment interest in bank records relating to his accounts. The RFPA is, in effect, a statutory Fourth Amendment for bank customers.

The RFPA permits individuals to contest government access to certain records held by banks and other financial institutions as defined by 12 U.S.C. § 3401(1), by requiring the government authority issu-ing a subpoena for bank records to notify the bank customer of the subpoena served on the financial institution, as well as the nature of the law enforcement inquiry to which the subpoena relates. The latter notification requirement reflects the provision in the RFPA that a government authority may obtain financial records "pursuant to judicial subpoena only if" such subpoena "is authorized by law and there is reason to believe that the records sought are relevant to a legitimate law enforcement inquiry." § 3407(1). The United States district courts have subject matter jurisdiction over proceedings generated by the Act. § 3410(a) (providing for "customer challenges" to a government subpoena). If a court finds, in response to a customer challenge, "that there is not a demonstrable reason to believe that the law enforcement inquiry is legitimate and a reasonable belief that the records sought are relevant to that inquiry," the court "shall order the process quashed or shall enjoin the Government authority's formal written request." § 3410(c).

Section 3410 of the RFPA sets forth the sole judicial remedy available to an individual who seeks to oppose disclosure of financial records to a government authority. Subsection (a) provides that the customer's motion to quash shall be accompanied by an affidavit stating (1) that the movant is a customer of the financial institution from which the financial records pertaining to him have been sought; and (2) that the movant's reasons for believing that the financial records sought are not relevant to the legitimate law enforcement inquiry, as stated by the government in its notice, or that there has not been substantial compliance by the government with the Act's notice provisions. If the court finds that the movant has complied with these requirements, "it shall order the Government authority to file a sworn re-

sponse," and in case of need "conduct such additional proceedings as it deems appropriate." § 3410(b). Congress intends that bank customers' challenges to government subpoenas be resolved quickly. Thus § 3410(b) goes on to provide: "All such proceedings shall be completed and the motion or application decided within seven calendar days of the Government's response."

## II. FACTUAL BACKGROUND

The SEC is charged by Congress with, *inter alia*, investigating possible violations of the nation's securities laws. The Securities Act of 1933 and the Securities Exchange Act of 1934 authorize the SEC to issue orders directing private investigations and designating officers to take testimony if it appears to the SEC, on the basis of a staff report or otherwise, that a possible violation of the securities laws has occurred. The designated investigative officers have the authority to issue subpoenas to compel testimony and examine documents.

### A. *The Account Given by the SEC*

The SEC has issued an investigation order dated April 28, 2005 ("the Order"), captioned "In the Matter of: Trading in the Securities of NBTY, Inc." ("NBTY"). Part I of the Order recites that NBTY "is a developer, manufacturer and distributor of nutritional supplements" whose common stock is registered with the SEC and publicly traded on the New York Stock Exchange. Part II recites that "[m]embers of the staff have reported information to the Commission which tends to show that: A. During the period from at least April to July 2004, certain persons or entities may have, in the offer or sale or in connection with the purchase or sale of the securities of NBTY, directly or indirectly" violated various provisions of the securities laws and the regulations promulgated by the SEC thereunder, including insider trading. *See* Order, Part II.B.[1]

The SEC's investigation into possible insider trading focuses upon one Morris Gad, the owner of a large jewelry business operating jewelry stores throughout the Caribbean, and a close friend of one Nathan Rosenblatt, an NYBT director. SEC staff inquiries disclosed that Gad had purchased NBTY stock and options in April 2004, shortly before the company announced record results for the second quarter of that year. Suspecting insider trading, the SEC staff sought to question Gad and Rosenblatt. Both asserted their Fifth Amendment privilege.[2]

The SEC investigators obtained Gad's securities account records, which revealed that in June 2003, "a year before the April and July 2004 trading at issue," SEC Op-

---

**1.** In support of his motion to quash the two subpoenas at issue, Davidov contends that the phrase "from at least April to July 2004" means that April to July 2004 is the only period of time covered by the investigation. While the phrase in question is not a model of clarity, the full text of the Order is inconsistent with so narrow a reading. Part III. of the Order directs that "a private investigation be made to determine whether the aforesaid persons or any other persons or entities have engaged, *are engaging, or are about to engage* in any acts or practices of similar purpose or object" (emphasis added), a clear indication (entirely consistent with common sense) that the investigators will be interested in conduct which occurred prior or subsequent to "April to July 2004," and indeed may be occurring at the present time. The SEC's verified opposition to Davidov's motion, quoted in text, indicates that April and July 2004 were the dates of the suspected insider trading "at issue."

**2.** The recitation of facts in Part II.A. of this Opinion are based for the most part on the factual account appearing in the SEC's sworn written opposition to Davidov's motion.

position at 2, 10,000 NYBT shares, with a value of $150,000, had been transferred into Gad's account from an account in the name of "Star Diamond." The Star Diamond account had been opened by the movant, Jora Davidov, and was held jointly by movant and his brother, Boris Davidov. Jora and Boris Davidov are in the jewelry business, as is Gad. Having learned of the involvement of Star Diamond with NBTY and Gad, the SEC staff obtained Star Diamond's trading records, which revealed that in addition to the June 2003 transfer of NBTY shares from Star Diamond to Gad's account, the Star Diamond account purchased NBTY securities immediately prior to the April 2004 earnings release (the incident that engaged the SEC's interest), and on the same day that Gad purchased NBTY securities.

This evidence, in the SEC's view, suggested that in April 2004 Gad might have tipped one or another of the Davidovs about the imminent and favorable NBTY earnings report. The SEC determined to question Jora Davidov about these transactions and his transactions or relations with NYBT and Gad generally. The SEC served Davidov with a subpoena dated July 21, 2005 directing him to testify before SEC officers and produce (a) his telephone records, diaries, and appointment books, etc., for the period April 1 through April 30, 2004, and (b) his securities trading accounts, documents concerning transactions in NBTY securities, and communications relating to NBTY for the period January 1, 2003 though December 31, 2004. Davidov testified before the SEC on August 9, 2005.[3] According to the SEC,

Davidov explained his 2003 transfer of 10,-000 NBTY shares from the Star diamond account to the Gad account by saying that he had purchased some jewels from Gad in 2003 and Gad instructed him to pay for them by purchasing 10,000 NYBT shares in the Star Diamond account and then transferring them to Gad's account.[4] As for his trading in NYBT shares in 2004, Davidov testified that he had not spoken to Gad about doing so and traded in NYBT securities because he believed the stock would rise.

Davidov's testimony left the SEC skeptical about his forthrightness and truthfulness. There were a number of reasons for this, including Jora Davidov's testimony that he thought his brother Boris had a trading account but did not know where it was; the investigation unearthed documents showing that Boris incorporated a synagogue, opened a securities trading account in its name, used that account to trade options, and received into that account transfers from Jora Davidov in the amount of $195,000 in August 2004 and $141,562 in October 2004. While Davidov furnished the SEC with copies of certain checks, they did not reflect the details of these two substantial fund transfers.

Spurred by their misgivings about Davidov's testimony and limited document production, the SEC issued the two subpoenas which form the subject matter of the present motion. The subpoenas are both dated December 16, 2005. They are addressed to banks where Jora (or Matte) Davidov maintain accounts: Bank Leumi USA and Citibank.[5] The subpoenas demand broad-

---

3. The date is taken from ¶ 7 of Davidov's affidavit.

4. Surely this is a convoluted way of paying for purchased jewels. One wonders why Davidov did not simply use the $150,00 purchase price for the NYBT shares and pay it to Gad for the jewels. The account of this transaction given

in Davidov's affidavit on this motion is not materially different. *See* Part II.B., *supra.*

5. Both subpoenas specify the same 16–digit account number. Presumably one of these numbers is incorrect, since Bank Leumi USA

ly worded and all-inclusive production of documents relating to these accounts. Davidov now moves to quash or modify these subpoenas.

## B. *The Account Given by Davidov*

█ In considering the account given by Davidov in support of his motion, I disregard entirely the unverified "Supplemental Affidavit of Jora Davidov" and the "Reply Memorandum of Law," both filed by successor counsel on January 30, 2005, after the SEC filed its verified opposition on January 12. I agree with the SEC that the RFPA's statutory scheme, with its emphasis upon speedy resolution of challenges to government subpoenas in aid of a legitimate law enforcement inquiry (clearly the case here), neither contemplates nor allows reply affidavits as of right by a bank customer. The customer makes his challenge by means of a motion and affidavit. The government makes a sworn response. Thereafter "the court may make conduct such additional proceedings as it deems appropriate," but only if "the court is unable to determine the motion or application on the basis of the parties' initial allegations," 12 U.S.C. § 3410(b). In the case at bar, I feel myself under no such inability, and have made no order for additional proceedings. The SEC muddies the waters somewhat by arguing in it's surreply at 2 that Davidov's reply submissions are "untimely," an adjective inspiring successor counsel for Davidov to invoke the doctrine of waiver; but the SEC's core contention, also stated in the surreply, is that "the language of the Act clearly does not provide a customer with the right to file a Reply," *id.*, a contention both correct and dispositive of the issue.

I turn, then, to Davidov's initial affidavit verified December 27, 2005 in support of

his RFPA-based challenge to the SEC's subpoenas. Davidov says that he produced documents called for by the SEC's original subpoena and appeared for deposition on August 9, 2005. Affidavit ¶ 7. He continues: "Both the document demands in the subpoena I was asked, were directed at the time period of January 1, 2003 and December 31, 2004 and concerned a person by the name of Morris Gad and trading in a company known as NBTY," adding that he answered "all of the questions asked of me, and fully disclosed all of my activity relating to NBTY and Morris Gad," *id.* ¶¶ 7, 8. Davidov says that he "provided the SEC with copies of Star Diamond's cancelled checks for the period of 2003–2004" because "I believed that the SEC was still pursuing its investigation into the sale of NYBT securities, and it was Star Diamond which purchased the NBTY securities." *Id.* ¶ 10. With respect to trading in NYBT securities, Davidov's affidavit states:

17. I (Star Diamond) purchased 10,-000 shares of NBTY in May 2003 at the direction of and for the benefit of Morris Gad. The stock was purchased as payment for diamonds. The shares were later transferred to Morris Gad and whatever profit resulted because of the increase in share price went to Morris Gad.

18. On April 22, 2004, I purchase [*sic*] and sold 100 options of NBTY making a profit of approximately $3,000. These shares were bought and sold in my Star Diamond Scottrade account for my and my corporation's own benefit.

19. I am not a big time trader. The amount of shares which I have purchased of NBTY or any other security has never been enough to affect the market price in any stock.[6]

---

and Citibank are separate and distinct financial institutions.

6. Davidov's disclaimer in the second sentence of ¶ 19 of his affidavit misses the point entire-

Based on these assertions, Davidov contends on his present motion that the SEC's two subpoenas seeking to reach his personal banking records are overbroad and fail to satisfy the requirements of "relevancy, specificity, and reasonableness in the scope of its subpoenas." Affidavit ¶ 22. Davidov prays for an order quashing the subpoenas addressed to Bank Leumi USA and Citibank, or in the alternative modifying the subpoenas "to only disclose checks and or deposits to or from a registered securities dealer," *id.*, last paragraph.

### III. DISCUSSION

█ Judge Mukasey's lucid opinion in *Matter of SEC Private Investigation/Application of John Doe re Certain Subpoenas,* No. M8–85, 1990 WL 119321 (S.D.N.Y. Aug. 10, 1990) ("*John Doe*"), deals comprehensively with the "relative burdens" of proof and persuasion inherent in the RFPA protocol. *Id.* at *2. The Act requires adjudication of a bank customer's motion "only when his affidavit presents a *prima facie* case of impropriety. Although no detailed evidentiary showing is necessary, plaintiff must show a factual basis for his conclusion that the records are irrelevant." *Id.* (citing and quoting *Hancock v. Marshall,* 86 F.R.D. 209, 211 (D.D.C. 1980)). If a movant meets that statutory burden, the RFPA "does not require the agency to show that the records are relevant, but rather that there is 'a reasonable belief that the records sought are relevant'.... What need be shown is not probable cause, but good reason to investigate. A mere belief is not enough, but a reasonable belief is." *Id.*

█ The SEC makes that showing in the case at bar. Davidov's principal contention is that he has fully disclosed the

SEC the details of his or Star Diamond's trading in NYBT securities, including the 2003 trades which implemented Davidov's unorthodox manner of paying Morris Gad for diamonds purchased from Gad. But this is an insider trading investigation, as was the SEC investigation in *John Doe;* and Judge Mukasey's analysis of the nature of such an investigation and the legitimate boundaries of subpoenas addressed to individuals' banking records is instructive.

In *John Doe* the SEC issued subpoenas to two New York City banks, seeking access to records of accounts maintained by the "John Doe" movant, a resident of England. Judge Mukasey's reasoning in rejecting the movant's challenges and enforcing the subpoenas closely parallels the case at bar, and consequently is worth quoting at some length:

> At most, plaintiff has shown that the time span covered by the subpoenas is greater than the trading and the transaction allegedly anticipated by the trading, that the SEC made an unsuccessful attempt to talk to plaintiff, and that the trading under investigation occurred in corporate accounts based in London while the personal bank accounts to which access is sought are located in this country. That does not show irrelevance or impropriety. The length of time covered by the subpoena—as a practical matter extending until October 1988 when the latter account was closed—is not unreasonable. There is no reason to believe that if payments were made for illicit information, such payments were confined to the few weeks or months immediately preceding and following the suspect trading and

ly. The SEC is not investigating manipulation of the price of NYBT. It is investigating insider trading. Tippees of material non-public information come in all shapes and sizes, and the amounts of their illicit trades may vary widely.

the later corporate transaction allegedly anticipated by such trading.... The SEC has shown that the plaintiff had control over brokerage accounts in which suspect trading occurred. That is enough to establish reasonable belief when one considers that the same statute deals with *investigative* subpoenas. Once a person's connection to apparently illicit conduct has been shown, it is relevant to know whether that person's bank account contains evidence of such conduct.... By showing that plaintiff has a connection to activity it is charged to investigate, the SEC has shown reason for a belief that the bank records it seeks here contain relevant information. Moreover, the records are limited to those that deal with transactions greater than $500, which assures that purely personal transactions in small amounts will not be disclosed.

1990 WL 119321, at *2 (emphasis in original).[7]

This reasoning resonates in the case at bar. The SEC investigation is focusing upon suspected insider trading in NYBT shares just before the public release of a favorable quarterly earnings report in April 2004. Morris Gad is a suspected principal tippee/tipper, owing to his friendship with a member of the NYBT board of directors. Gad and Davidov were close associates in the jewelry business; the adjective "close" is justified by Davidov's accommodating Gad's request for the unusual method. of payment for diamonds in 2003 through the back-to-back purchase and sale of NYBT shares. Davidov purchased NYBT options and sold them at a profit in April 2004, the precise time of the alleged insider trading in that company's securities. Davidov

says in his affidavit that his profit was only $3,000, but that is a useful sum. As noted, Davidov describes himself as "not a big time trader," a self-deprecating portrait permitting the inference that when Davidov traded in April 2004, he was acting on tipped insider information. Counsel for the SEC stated at the oral argument that the investigation has unearthed records showing a number of payments in the suggestive amounts of just under $10,000 passing between Gad and Davidov or the Star Diamond account (controlled by Davidov). No reference to such payments appears in the SEC's submissions on this motion, which placed Davidov's able successor counsel at something of a disadvantage at the oral argument; nonetheless, I accept the representations of SEC counsel as an officer of the Court, and include such payments in the calculus of the case.

In these circumstances, I conclude without difficulty that, in Judge Mukasey's words, Davidov's "connection to apparently illicit conduct has been shown," with the result that "it is relevant to know whether that person's bank account contains evidence of such conduct." The apparently illicit conduct in this case is insider trading in NYBT shares, with Morris Gad (who invoked the Fifth Amendment) at the heart of the investigation and Davidov and the corporation he controls, Star Diamond, intertwined with Gad in peculiar and suggestive ways. There may be an entirely innocent reason for the distinctly odd manner in which Gad and Davidov structured a payment for diamonds through the medium of trading in NYBT shares, but that transaction, together with Davidov's trading in NYBT options at the time of the alleged insider trading and evidence of

---

7. On the last point, the records sought by the bank subpoenas at bar are limited to transactions greater than $250.

payments flowing between Gad and Davidov in suggestive amounts and for possibly problematic or incriminating purposes, combine to establish a reasonable belief on the part of the SEC that the *investigative* subpoenas at bar may lead to evidence relevant to the investigation.

For the foregoing reasons, Davidov's motion to quash or modify the SEC's subpoenas is denied. The subpoenas will be enforced.

It is SO ORDERED.